# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | |
|---|---|
| LISA ROBERTS, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
|   v. | )    **Case number 4:06cv1412 TCM** |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security,[1] | ) |
| | ) |
|     Defendant. | ) |

## MEMORANDUM AND ORDER

This 42 U.S.C. § 405(g) action for judicial review of the final decision of Michael J. Astrue, the Commissioner of Social Security ("Commissioner"), denying the application of Lisa Roberts for disability insurance benefits ("DIB") under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 401-433, is before the Court[2] for a final disposition. Ms. Roberts has filed a brief in support of her complaint; the Commissioner has filed a brief in support of his answer.

## Procedural History

---

[1]Mr. Astrue was sworn in as the Commissioner of Social Security on February 12, 2007, and is hereby substituted as defendant pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.

[2]The case is before the undersigned United States Magistrate Judge by written consent of the parties. See 28 U.S.C. § 636(c).

Lisa Roberts ("Plaintiff") filed a DIB application in March 2003,[3] alleging she was disabled as of May 31, 2001, because of a bipolar disorder and generalized anxiety disorder. (R.[4] at 75-77.)  Her application was denied initially and after a hearing held in March 2005 before Administrative Law Judge ("ALJ") Jhane Pappenfus  (Id. at 11-21, 52-55, 301-39.) The Appeals Council then denied Plaintiff's request for review, thereby adopting the ALJ's decision as the final decision of the Commissioner.  (Id. at 3-5.)

## Testimony Before the ALJ

Plaintiff, represented by counsel, was the only witness to testify at the administrative hearing.

Plaintiff testified that she had been in four rehabilitation programs for polysubstance abuse.  (Id. at 312.)  The last was in 2002 and was completed in three months.  (Id. at 313.) She had been arrested once for outstanding traffic tickets, and had spent two days in jail. (Id.)  Plaintiff is seeing a psychiatrist, Dr. Franco Sicuro, every month.  (Id. at 314.)  He has prescribed two daily medications, Lexapro and Seroquel.  (Id.)  The medications make her drowsy.  (Id. at 338.)

Asked about the feelings that prevent her from working, Plaintiff replied, "[d]epression and mood disorders, panic attacks, anxiety, nerves."  (Id. at 314.)  She is

---

[3]Plaintiff had previously applied for supplemental security income; that application was denied in October 1999.  The adverse decision was not appealed.

[4]References to "R." are to the administrative record filed by the Commissioner with his answer.

depressed every day and feels hopeless.  (Id. at 314-15.)  She spontaneously cries, on the average, every other day.  (Id. at 315.)  She is often tired.  (Id.)

Although Plaintiff did not currently feel suicidal, she had felt so a few weeks before. (Id.)  She had then been thinking about the loss of her children,[5] her pending divorce, and her difficulties with her father.  (Id.)  She feels overwhelmed and has problems concentrating.  (Id. at 316-17.)

Asked about her mood disorder, Plaintiff explained that she could be "really, really happy" and then suddenly be "really, really depressed."  (Id. at 317.)  She calls her father, her caseworker, or a friend when she is depressed.  (Id. at 321.)  Asked about her panic attacks, she explained that her chest starts hurting and she feels she cannot breathe.  (Id. at 317.)  This happens every other day.  (Id. at 318.)  Also during these attacks her head and back hurt.  (Id.)  She lies or sits down for five to ten minutes to alleviate the attacks.  (Id. at 318-19, 320-21.)

Plaintiff wakes up between eight and nine o'clock in the morning and goes to bed around nine or ten o'clock at night.  (Id. at 319.)  If she takes her medication, she falls asleep immediately.  (Id.)  She wakes up in the middle of the night, and has had trouble sleeping all her life.  (Id.)  She has bad dreams twice a week and recalls painful memories every day. (Id. at 320.)  She does not take naps during the day.  (Id.)

---

[5]Plaintiff later testified that she had lost custody of her children five years before.  (Id. at 337.) Other records indicate that a baby born to her in November 2000 tested positive for a drug screen and a baby born to her in February 1999 tested positive for cocaine.  (Id. at 126.)

Plaintiff dresses herself.  (Id. at 320.)  She cleans, vacuums, takes out the trash, cooks, and does the laundry and dishes.  (Id. at 322-23.)  When she cooks a big meal, she cannot talk to anyone because she is easily distracted.  (Id. at 323.)  She can drive, but no longer has a license because of unpaid traffic tickets.  (Id.)  She spends her days doing household chores and reading.  (Id. at 325.)  She has difficulty concentrating and sometimes takes all day to read the newspaper.  (Id. at 325-26.)  She also watches television, although she is easily distracted.  (Id. at 326.)

Plaintiff does not like to be in a crowd – more than six people – and does not like to go to the grocery store by herself.  (Id. at 324.)  She has been trying to help an elderly man with his laundry, household cleaning, cooking, and paperwork.  (Id. at 306, 307, 328-33.)  Plaintiff described her relationship with the man, in part, as follows:

> . . . [H]e needed some care and I tried to take care of him for a while, then I was unable to do it because it was way too much for me.
>
> Q.     Okay.  When did you start caring for him?
>
> A.     Oh, it was off and on like last year, and then he's got, he's got other people that come in like three times a week now to help out to take care of him.  But he needs like – his family has decided, coming to the decision that he may need to get moved out by them and because he's getting older and he's not taking care of himself and I can't – I don't have the – like my BJC says I am not capable of – I have to take care, I've got to take care of myself before I can take – he needs 24-hour care more or less and I can't do it.

(Id. at 307.)

Later in the hearing, Plaintiff testified that she "had called for [the elderly man's] tax papers."  (Id. at 330.)  Asked by the ALJ if she was doing the man's paperwork for him,

Plaintiff replied that she was "trying" to "make out his bills for him." (<u>Id.</u> at 331.) She tried to help him a couple of hours a day, but he wanted her to spend all day and night with him to keep him company. (<u>Id.</u> at 331-32, 333.) She helps him "do the dinner" and does laundry once a week. (<u>Id.</u> at 332.) She reads one section of the newspaper to him, but cannot concentrate to read any more. (<u>Id.</u>)

Plaintiff further testified that her depression prevented her from working. (<u>Id.</u> at 333, 335.) She quit her last job because her husband had given her a black eye and she did not want to go to work looking as she did. (<u>Id.</u> at 334.) She quit school because of her husband's physical abuse. (<u>Id.</u>) She stopped working at Steak n' Shake because she moved and could not get to work. (<u>Id.</u> at 335.)

Plaintiff has been on medication for a mental impairment since she was 16 years old.[6] (<u>Id.</u> at 336.) She attends meetings for her polysubstance abuse when she can. (<u>Id.</u> at 337.)

<u>**Medical and Other Records Before the ALJ**</u>

The documentary record before the ALJ included forms Plaintiff completed as part of the application process, documents generated pursuant to her application, records from various health care providers, and evaluation reports.

When applying for DIB, Plaintiff completed a disability report listing her impairments as bipolar disorder, generalized anxiety disorder, manic episodes, and depression. (<u>Id.</u> at 156.) She could not work when on medication and had crying spells and manic episodes. (<u>Id.</u>) Her conditions caused her headaches and back pain. (<u>Id.</u>) These conditions first

_____

[6]Plaintiff was born on February 15, 1968, and was 37 years old at the time of the hearing.

bothered in August 1984 when she was hospitalized for depression. (Id.) They prevented her from working on May 31, 2002.[7] (Id.) She stopped working on November 18, 2001. (Id.) Her children had been taken from her and she was very ill. (Id.) She could not concentrate, eat, sleep, or think straight. (Id.)

Two months later, Plaintiff's caseworker also completed a daily activities questionnaire, reporting that she had known Plaintiff for one month and that Plaintiff had been in a "manic state" for weeks. (Id. at 99.) Also, Plaintiff had been having mild withdrawal symptoms from stopping Xanax. (Id.)

Plaintiff reported on another form, completed in May 2003, that pain, headaches, shortness of breath, a bipolar disorder, varicose veins, and a broken wrist prevented her from working. (Id. at 91.) The specific symptoms were depression, pain in her wrist, bipolar, and generalized anxiety. (Id.) She could not concentrate and had a short memory span. (Id.) She was taking Depakote and Seroquel. (Id. at 92.) These medications made her tired and caused hair loss and weight gain. (Id.) She was able to do chores and run errands. (Id. at 93.) She had difficulty sleeping, and always had had. (Id. at 94.) She was sometimes too depressed to get cleaned up. (Id.) During the day, she attended school or did volunteer work for a few hours. (Id.) She could not stay focused long enough to watch a television show for longer than thirty minutes. (Id.) She did not have problems getting along with people, nor did they have problems getting along with her. (Id. at 96.)

_____

[7]This is one year later than the date alleged in her application.

In a form completed after the initial denial of her DIB application, Plaintiff stated that her condition had worsen after September 1, 2003. (Id. at 135.) She sometimes lost interest in life. (Id.) Her back and shoulder were injured in a fall at a store.[8] (Id.) She took a medication, Seroquel, for her bipolar disorder; it sometimes caused her to be very tired. (Id. at 138.). Her depression did not affect her personal grooming as much as it affected her ability to work. (Id. at 139, 140.) She could not focus or concentrate on anything for long. (Id. at 140.)

Plaintiff had reported annual earnings in the years 1984 through 2002, inclusive, and in 2004. (Id. at 58.) Her highest annual earnings were $8,800.35, in 1990. (Id.) In only seven of the twenty years in which she had reported earnings were the annual totals greater than $5,000. (Id.) And, two of those years were 2000 and 2001. (Id.)

The list of Plaintiff's medications presented at the hearing named two prescriptions for depression: Lexapro and Seroquel. (Id. at 87.) Both were prescribed by Dr. Sicuro. (Id.) Plaintiff consulted him monthly for her bipolar disorder, depression, and anxiety. (Id. at 89.)

The medical records before the ALJ begin in 1999 and primarily are related to Plaintiff's psychiatric problems.

Plaintiff's medical records begin in February 1999 with the records of DePaul Health Center ("DePaul") relating to the birth of her third child. (Id. at 282-96.) The baby tested positive for a drug screen. (Id. at 283.) The Division of Family Services was notified. (Id.)

_____

[8]Plaintiff testified at the hearing that she settled a claim against the store for her injuries.

Three months later, Plaintiff returned to DePaul with complaints of back pain and injuries to her nose after she walked into a door and fell.  (Id. at 275-81.)  Two weeks later, on May 20, Plaintiff was brought to the emergency room "with change in mental status."  (Id. at 270-74.)  A computed tomography ("CT") scan of her head was negative; however, a drug screen was positive for opiates, cocaine, benzodiazepines, and tricyclics.  (Id. at 271.)  When Plaintiff woke up, she refused psychiatric help and left against medical advice.  (Id. at 272.)

Plaintiff returned to DePaul in November 2000 for the birth of her fourth child.  (Id. at 255-69.)  It was noted on her medical records that she had had no prenatal care and that the baby had a positive drug screen.  (Id. at 256.)

Plaintiff was admitted again to DePaul in September 2001 after she (a) had stopped taking her psychotropic medication for at least the previous six months and (b) had instead been using  crack cocaine and drinking regularly.  (Id. at 247-54.)  "She was admitted because of suicidal ideation."  (Id. at 248.)  The admitting physician was Franco Sicuro, M.D.  (Id. at 247.)  The record notes both that she claimed feeling suicidal and also claimed that she was not.  (Id. at 248.)  The record also notes that Plaintiff had had "multiple" psychiatric admissions and had been using crack cocaine since she was 21. (Id. at 253.)  She was placed back on the psychotropic medication and was released  the next day with a referral to the BJC Behavioral Health Center ("BJC").  (Id. at 254.)

The next month, Plaintiff underwent a psychosocial assessment by Laura Kaupas, a licensed clinical social worker, in order to be eligible for psychiatric and other support services from BJC.  (Id. at 238-45.)  Her "[m]ood was sad and very anxious"; her "[a]ffect

was hypertalkative and tearful." (Id. at 238.) She was not clear about what medications she was supposed to be taking. (Id.) Her Global Assessment of Functioning[9] score ("GAF") was 55.[10] (Id. at 240.) Her history of substance abuse included the first drink at 16, the first use of marijuana at 16, the first use of crack cocaine at 18, and the first use of methamphetamine at 20. (Id. at 241.) She still used these substances, to varying degrees and frequencies. (Id.) She had also abused prescription drugs, including Xanax. (Id.) She was working two jobs to support herself and her husband and was making approximately $900 each month before taxes. (Id. at 242, 243.) She requested a meeting with "'whoever can help [her] with getting disability now.'" (Id. at 242.) She also wanted a vocational assessment. (Id. at 243.) A psychiatric evaluation and medication regimen were recommended. (Id. at 244.)

The records of Dr. Sicuro begin the next month, on November 27.[11] (Id. at 170.) He noted that Plaintiff admitted being severely depressed and helpless. (Id.) She denied using drugs or drinking alcohol. (Id.) Dr. Sicuro questioned whether her hyperactivity was

_____

[9]"According to the [Diagnostic Manual], the Global Assessment of Functioning Scale is used to report 'the clinician's judgment of the individual's overall level of functioning.'" **Hudson v. Barnhart**, 345 F.3d 661, 663 n. 2 (8th Cir. 2003). See also **Bridges v. Massanari**, 2001 WL 883218, *5 n.1 (E.D. La. July 30, 2001) ("The GAF orders the evaluating physician to consider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." (interim quotations omitted)).

[10]A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." Diagnostic Manual at 34 (alteration added).

[11]This record refers to the visit as being for a follow-up. (Id. at 170.) It is not clear whether it is a follow-up from Plaintiff's admission the previous month or from an earlier visit, the record of which is not included in the administrative record.

attributable to an attention deficit disorder and hyperactivity disorder. (Id.) He had the same question at Plaintiff's January 2002 session. (Id. at 171.) At Plaintiff's next session, in February, Dr. Sicuro described her as "hyper," "manic," and mildly paranoid. (Id. at 172.) She was less so at the next session. (Id. at 173.) She had been admitted to a vocational rehabilitation program and was planning on divorcing her husband. (Id.) She reported feeling better on the Seroquel. (Id.) Two sessions later, in May, Plaintiff repeated that she was feeling better on Seroquel. (Id. at 174.) She admitted "some depression" and she still had mood swings. (Id.) She had gotten a job. (Id.) At her August session, Plaintiff was depressed and had mood swings. (Id. at 175.)

On October 24, one year after her psychosocial assessment by Ms. Kaupas, another such assessment of Plaintiff was performed by her assigned case manager, Millie Fortune-Gilpin, M.S.W., a licensed clinical social worker. (Id. at 227-37.) Plaintiff's mood ranged from manic to depressed; her affect ranged from agitated to anxious. (Id. at 231.) Her speed was "mildly pressured, but clear and audible"; her thought content was rapidly changing, "but strived to be logical and goal-directed." (Id.) She wanted assistance with housing, "acquiring Social Security Disability," and in beginning substance abuse treatment. (Id.) She wanted to hold her own job and own her own home and car. (Id.) It was reported that she had been evicted from one housing program because she had three violations of their rules and had been evicted from another program after one month because she would not honor the curfews. (Id. at 233.) She would sometimes stay with friends, but would always end up being evicted. (Id.) She reported that she is able to get a job, but not maintain one.

(Id.)  Ms. Fortune-Gilpin opined that Plaintiff had relapsed into using crack cocaine the previous month.  (Id. at 235.)  She noted that Plaintiff's bipolar disorder was "well-treated and monitored," but her crack cocaine addiction was not.  (Id. at 236.)  Ms. Fortune-Gilpin also noted that she would arrange appointments for Plaintiff for individual and group therapy, but Plaintiff would always miss them for one reason or another.  (Id. at 236-37.)  Plaintiff's current GAF was assessed as 40.[12]  (Id. at 232.)

Four days later, Plaintiff reported to Dr. Sicuro that she was living in a shelter and using cocaine daily.  (Id. at 177.)  She denied drinking alcohol.  (Id.)  She had separated from her husband and was taking her medication.  (Id.)  The diagnosis was schizoaffective disorder and cocaine abuse.  (Id.)  The next month, on November 25, Plaintiff reported having mood swings and feeling pressured.  (Id.)

Two days later, Plaintiff entered an in-patient treatment program at the Aquinas Treatment Center for crack cocaine abuse.  (Id. at 213, 215, 220, 226.)  She displayed minimal participation in the program, and was discharged nine days later against staff advice.  (Id. at 213-14, 218-23.)  Her diagnosis was cocaine dependence; her GAF was 45.[13]  (Id. at 215, 224.)

---

[12]A GAF score between 31 and 40 is indicative of "[s]ome impairment in reality testing or communication (e.g., speech is at time illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work . . .) ."  Diagnostic Manual at 34.

[13]A GAF score between 41 and 50 is indicative of "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  Diagnostic Manual at 34.

Dr. Sicuro saw Plaintiff again in April 2003. (Id. at 176.) He noted that she had been in and out of jail. (Id.) She had pressured speech and was "manicky." (Id.) In August, Plaintiff reported feeling more stable, although she had difficulty concentrating. (Id. at 178.) She continued to talk fast and to have a high anxiety level. (Id.) In October, she was not using drugs and had been out of medication for a week. (Id.)

In November, Plaintiff informed Dr. Sicuro that she was not depressed and was feeling good. (Id. at 179.) She admitted that she had "some" hyperactivity. (Id.) She was going to school. (Id.) In January 2004, Plaintiff was living in a halfway house. (Id.) Dr. Sicuro questioned whether she had improved. (Id.) Plaintiff saw Dr. Sicuro again in March May, August, November, December, and January 2005. (Id. at 180-84.) She was routinely described as being anxious and having pressured speech. (Id.)

While she was being treated by Dr. Sicuro, Plaintiff was also being counseled by Ms. Fortune-Gilpin.

In January 2004, Ms. Fortune-Gilpin noted that Plaintiff reported a good therapeutic alliance with Dr. Sicuro. (Id. at 191.) He had revised her psychotropic medication and had placed her on Lamutal and Seroquel. (Id.) Plaintiff's only physical concerns were the need for dental work. (Id.) She continued to work has a home health care aide for her landlord and was attending a program to become a medical assistant. (Id. at 191, 193.) Her crack cocaine addiction was in remission. (Id. at 193.) Her GAF was 60.[14] (Id. at 195.)

---

[14]See note 10, supra.

Ms. Fortune-Gilpin's notes from Plaintiff's April 2004 session read, in relevant part, as follows.

> Lisa continues to report good therapeutic alliance with Dr. Sicuro. . . . Lisa is trying to "make due" by residing with an elderly man providing live-in care. Lisa expresses mixed feelings about this arrangement. . . Lisa attempted to get into Substance Abuse treatment after losing a job to a urine drop that pointed out ETOH and Crack Cocaine in her body. However, Lisa reported that she was not completely ready because she needs to take care of the elderly man. Lisa had one psychiatric hospitalization secondary to overdosing on ETOH and Crack Cocaine in February 2004.
>
> Meanwhile, Lisa has placed her medical assistant education program on hold. . . .

(Id. at 189.)

The ALJ also had before her psychiatric evaluations of Plaintiff.

In June 2003, Plaintiff was evaluated by Mark H. Kinder, Ph.D. (Id. at 201-03.) Plaintiff was then living in a shelter for battered women. (Id. at 201.) Dr. Kinder noted Plaintiff's history of depression, manic behaviors, and substance abuse and that she had been in a structured residential environment for 90 days and had not used drugs or alcohol during that time. (Id. at 201, 202.) He further noted that she had not worked since 2001 and that her "substance abuse and psychiatric problems have created repeated problems on the job." (Id. at 201.) Her only physical medical problem was varicose veins. (Id. at 202.) She had first been hospitalized for psychiatric problems when she was 16 and had had at least 6 such hospitalizations. (Id.) The symptoms of her anxiety included "worry, feeling shaky, restlessness, easily fatigued, shortness of breath, hot flashes, feeling keyed up, difficulty concentrating, trouble falling asleep, dry mouth, and irritability." (Id.) The symptoms of her

depression included "recent weight loss, feelings of worthlessness and hopelessness, impaired concentration, and poor sleep." (Id. at 202-03.) Dr. Kinder further reported:

> . . . Most of [Plaintiff's] past employment was as a waitress or cashier. [Plaintiff] reported that she worked at one place for 12 years. [Plaintiff] was inconsistent when she talked about her difficulties working now. At one point she indicated that her concentration was such a problem that she could not stay focused, that she forgets easily, and cannot stay with anything for long. She wondered if she had an attention deficit. Later in the interview, [Plaintiff] stated that she could not think of any problems that would prevent her from working.

(Id. at 203.) On examination, the only manic behavior was rapid speech and an occasional failure to complete a sentence before starting another. (Id.) She was alert and oriented to time, place, and person and "exhibited a grossly intact attentional capacity." (Id.) "She demonstrated an appropriate affect. [Her] manner of relating to [Dr. Kinder] was pleasant and cooperative." (Id.) He assessed Plaintiff's current GAF as 58.[15] (Id. at 202.)

In November 2003, an unnamed clinician with a community behavioral health clinic wrote a five-page assessment of Plaintiff. (Id. at 196-200.) He described her as alert and oriented to time, place, and person. Her mood frequently ranged from manic to depressed; her affect ranged from anxious to agitated and could be pleasant; her speech was pressured, but clear; her thought process could "be racing when mental illness [and] addiction illness is not in remission." (Id. at 196.) "However, [Plaintiff] can be logical and goal directed when both her mental and addiction illnesses are in remission." (Id.) The clinician noted that Plaintiff had earlier been prescribed Xanax, but the prescription was discontinued after

---

[15]See note 10, supra.

the drug failed to produce the hoped-for therapeutic effect and Plaintiff "presented behavior positive for Xanax addiction." (Id. at 197.) Although Plaintiff had self-destructive behavior, she did not have suicidal or homicidal ideation. (Id.) The clinician also noted that Plaintiff had successfully completed two inpatient substance abuse treatment programs. (Id. at 199.) He concluded that she had several symptoms of a borderline personality disorder: "[f]rantic efforts to avoid real or imagined abandonment[;]" "[a] pattern of unstable and intense interpersonal relationships[;]" and "[i]dentity disturbance or persistently unstable self image or sense of self[.]" (Id.)

In July 2003, R. Rocco Cottone, Ph.D., completed a Mental Residual Functional Capacity Questionnaire. (Id. at 110-13.) Of twenty listed mental activities, Plaintiff was assessed as being markedly limited in the ability to understand and remember detailed instructions; the ability to carry out detailed instructions; and the ability to interact appropriately with the general public. (Id. at 110-11.) She was moderately limited in her ability to maintain attention and concentration for extended periods; her ability to sustain an ordinary routine without special supervision; her ability to work in coordination with or proximity to others without being distracted by them; her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace; her ability to accept instructions and respond appropriately to criticism from supervisors; her ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; her ability to be aware of normal hazards and take appropriate precautions; and her ability to set realistic goals or make plans

independently of others. (Id.) Either she was not significantly limited or there was no evidence of any limitation in the remaining categories. (Id.) Dr. Cottone concluded that Plaintiff "must avoid work involving [a] intense or extensive interpersonal interaction[;] [b] close coordination or communication with other workers or supervisors[;] [c] proximity to available controlled substances[;] and [d] public contact by phone or in person[.]" (Id. at 112.) On the other hand, Plaintiff could [a] understand, remember, carry out and persist at simple tasks[;] [b] make simple work-related judgments[;] [c] relate adequately to co-workers and supervisors[;] and [d] adjust adequately to ordinary changes in work routine and settings[.]" (Id.)

The same month, Dr. Cottone also completed a Psychiatric Review Technique form ("PRTF") for Plaintiff. (Id. at 114-27.) He concluded that she had an affective disorder and a substance addiction disorder. (Id. at 114.) These disorders resulted in moderate restrictions of her activities of daily living, marked difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, and pace, and one or two episodes of decompensation of any duration. (Id. at 124.)

The ALJ also had before her a Mental Medical Source Statement completed by Dr. Sicuro in February 2005. (Id. at 166-69.) Of seventeen listed mental activities, Plaintiff was rated as markedly limited in all but two. (Id. at 166-67.) In those two – the ability to behave in an emotionally stable manner and the ability to maintain socially acceptable behavior – she was extremely limited. (Id.) Dr. Sicuro concluded that she had had one or two episodes of decompensation in the past year. (Id. at 168.) She also had a substantial loss of an ability

to (a) understand, remember, and carry out simple instructions, (b) make judgments that were commensurate with the functions of unskilled work; (c) respond appropriately to supervision, co-workers, and usual work situations; and (d) deal with changes in a routine work setting. (Id.) He opined that these limitations had, or would, last for at least twelve continuous months. (Id.) The date of onset was 2002. (Id.)

On the same form, Dr. Sicuro listed his diagnoses as schizoaffective disorder, manic, and polysubstance abuse. (Id. at 169.) Plaintiff's GAF as of January 2005 was 45.[16] (Id.) In the previous year, her highest GAF had been 50,[17] the lowest was 30.[18] (Id.)

Plaintiff's caseworker, Ms. Fortune-Gilpin, also completed a Mental Medical Source Statement in February 2005 on her behalf. (Id. at 185-17.) She assessed Plaintiff's ability to function in the seventeen categories as moderately limited in four, markedly limited in seven, and extremely limited in six. (Id. at 185-86.) She concluded that Plaintiff had had three episodes of decompensation and did not have a substantial loss in her ability to understand, remember, and carry out simple instructions. (Id. at 187.) She listed October 2001 as the date of onset of Plaintiff's disability. (Id.) She also noted that Plaintiff had "mood swings and extremely disorganized thinking" when she was not taking the Seroquel.

_____

[16]See note 13, supra.

[17]See note 13, supra.

[18]A GAF score between 21 and 30 is indicative of "[b]ehavior . . . considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends)." Diagnostic Manual at 34.

(Id. at 188.)  When she did take the medication, her thoughts were still disorganized, but she made less dangerous decisions.  (Id.)  Her diagnosis was schizoaffective disorder, bipolar type, and borderline personality disorder.  (Id.)  Ms. Fortune-Gilpin assessed Plaintiff's current GAF as 40.[19]  (Id.)

## The ALJ's Decision

Addressing the first of the five-step evaluation process, see page 20, below, the ALJ first determined that Plaintiff had engaged in substantial gainful activity as of March 2004. Specifically, her "wide range of duties" for the elderly man were those of a home attendant.[20] (Id. at 13.)  She was "essentially on call throughout the day and night" and the room and board she received in exchange was worth at least $810 a month.  (Id.)

The question then was whether she was disabled under the sequential evaluation process for the period between May 2001 and March 2004.  (Id.)

The ALJ determined that Plaintiff had severe mental impairments of a schizoaffective disorder and history of polysubstance abuse.  (Id. at 14.)  The former resulted in a mild restriction of activities of daily living; a moderate, at most, restriction in social functioning; and a moderate impairment of concentration, persistence, or pace.  (Id. at 14-15.)  A consideration in the ALJ's determination was Plaintiff's continued employment "provid[ing]

_____

[19]See note 12, supra.

[20]See Id. at 81-85 for a description of "home attendant" in the Dictionary of Occupational Titles.

full time care for a blind individual" and her ability "to concentrate sufficiently to fulfill her job duties for a home attendant." (Id. at 14.)

Addressing the question of Plaintiff's residual functional capacity ("RFC") during the May 2001 to March 2004 period, the ALJ assessed the credibility of Plaintiff's complaints, finding that (1) Plaintiff (a) continued to "successfully work as a home attendant" and (b) stopped working at two other jobs for reasons unrelated to her mental impairments; (2) Plaintiff had a history of poor compliance with treatment; and (3) she improved with treatment and medication. (Id. at 16.) The ALJ next noted the findings of the consultative examiner that Plaintiff was alert and oriented, her speech was fluent without blocking or dysonomia, her judgment was intact, her affect was appropriate, her cognitive endurance was fair, her frustration tolerance was intact, and her insight was poor. (Id. at 17.) The examiner also reported that Plaintiff related pleasantly and cooperatively. (Id.) On the other hand, the ALJ discounted the conclusions of the psychiatrist and social worker on the preprinted forms, finding, in part, that the limitations noted on these forms were inconsistent with their treatment records. (Id.) The ALJ noted the request of Plaintiff in October 2001 that she meet with someone who could help her get disability and opined that she sought treatment "merely to bolster her claim for disability benefits." (Id.) Plaintiff's daily activities included attending classes to become a medical assistant and providing continuous care for a blind man in his home. (Id.)

Based on her assessment of the evidence, the ALJ concluded that Plaintiff had the ability to perform work involving the understanding, remembering and carrying out of simple

instructions and the making of simple work related decisions and to engage in at least medium exertional activities. (Id. at 18.) This RFC combined with Plaintiff 's age, education (a GED and some college course work), and work experience directed a finding that she was not disabled within the meaning of the Act. (Id. at 19.)

### Legal Standards

Under the Social Security Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A). The impairment suffered must be "of such severity that [the claimant] is not only unable to do [her] previous work, but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B) (alterations added).

The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520. See also **Johnson v. Barnhart**, 390 F.3d 1067, 1070 (8th Cir. 2004); **Ramirez v. Barnhart**, 292 F.3d 576, 580 (8th Cir. 2002); **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2002). First, the claimant cannot be presently engaged in "substantial gainful activity." See 20 C.F.R. § 404.1520(b). "Substantial gainful activity" is work that "involves doing significant physical or mental activities" and is done for pay or profit. 20 C.F.R. § 404.1572(a) and (b). Second, the claimant must have a severe impairment. See 20 C.F.R. § 404.1520(c). The Social Security

Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . ." Id. (alteration added). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." **Caviness v. Massanari**, 250 F.3d 603, 605 (8th Cir. 2001).

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement.  See 20 C.F.R. § 404.1520(d), and Part 404, Subpart P, Appendix 1.  If the claimant meets these requirements, she is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

At the fourth step in the process, the ALJ "review[s] [claimant's] residual functional capacity and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. §§ 404.1520(e) and 416.920(e) (alterations added).  "[RFC] is what the claimant is able to do despite limitations caused by all the claimant's impairments." **Lowe v. Apfel**, 226 F.3d 969, 972 (8th Cir. 2000) (citing 20 C.F.R. § 404.1545(a)) (alteration added). "[RFC] 'is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (quoting McCoy v. Schweiker, 683 F.2d 1138,

1147 (8th Cir. 1982) (en banc)) (alteration added).  Moreover, "[RFC] is a determination based upon all the record evidence[,]" not only medical evidence.  **Dykes v. Apfel**, 223 F.3d 865, 866-67 (8th Cir. 2000) (alterations added).  Some medical evidence must be included in the record to support an ALJ's RFC holding.  **Id.** at 867.  "The need for medical evidence, however, does not require the [Commissioner] to produce additional evidence not already within the record.  '[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'"  **Howard v. Massanari**, 255 F.3d 577, 581 (8th Cir. 2001) (quoting Frankl v. Shalala, 47 F.3d 935, 937-38 (8th Cir. 1995)) (alterations in original).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility.  **Ramirez**, 292 F.3d at 580-81; **Pearsall**, 274 F.3d at 1217.  This evaluation requires that the ALJ consider "(1) a claimant's daily activities, (2) the duration, frequency, and intensity of pain, (3) precipitating and aggravating factors, (4) dosage, effectiveness, and side effects of medication, and (5) residual functions."  **Ramirez**, 292 F.3d at 581 (citing Polaski v. Heckler, 739 F.2d  1320, 1322 (8th Cir. 1984) (subsequent history omitted)).  Although an ALJ may not disregard subjective complaints of pain based only on a lack of objective medical evidence fully supporting such complaints, "an ALJ is entitled to make a factual determination that a Claimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary."  **Id.**  See also **McKinney v. Apfel**, 228 F.3d 860, 864 (8th Cir. 2000) ("An ALJ may undertake a credibility analysis when the medical evidence regarding a claimant's disability is inconsistent.").  After considering the Polaski

factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

The burden at step four remains with the claimant. See **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001); **Singh**, 222 F.3d at 451. "It is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC." **Pearsall**, 274 F.3d at 1217.

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Banks**, 258 F.3d at 824. See also 20 C.F.R. § 404.1520(f). The Commissioner may meet his burden by referring to the medical-vocational guidelines (the "Grid") or by eliciting testimony by a vocational expert. **Pearsall**, 274 F.3d at 1219. The Grid may not be relied on if the claimant suffers from non-exertional impairments unless those impairments "do not diminish or significantly limit the claimant's [RFC] to perform the full range of Guideline-listed activities[.]" **Ellis v. Barnhart**, 392 F.3d 988, 996 (8th Cir. 2005) (alterations added; interim quotations omitted).

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court if it is supported by "substantial evidence on the record as a whole." **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001); **Clark v. Apfel**, 141 F.3d

1253, 1255 (8th Cir. 1998); **Frankl**, 47 F.3d at 937. "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the decision." **Strongson v. Barnhart**, 361 F.3d 1066, 1069-70 (8th Cir. 2004) (interim quotations omitted). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the court must also take into account whatever in the record fairly detracts from that decision. **Warburton v. Apfel**, 188 F.3d 1047, 1050 (8th Cir. 1999); **Baker v. Apfel**, 159 F.3d 1140, 1144 (8th Cir. 1998). The court may not reverse that decision merely substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it "might have decided the case differently." **Strongson**, 361 F.3d at 1070. Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [Court] must affirm the agency's decision." **Wheeler v. Apfel**, 244 F.3d 891, 894-95 (8th Cir. 2000) (alteration added).

### Discussion

Plaintiff argues that the ALJ (a) erred by not calling a vocational expert and (b) lacked medical evidence to support her RFC assessment. The Commissioner disagrees.

The Court will address Plaintiff's arguments in the reverse order in which they are presented.

As noted by Plaintiff, the ALJ's findings relative to her position with the elderly man are the linch-pin of the ALJ's conclusions about her RFC. These findings, however, are not supported by the record. Plaintiff testified that she helped the man two to three hours a day.

There was no testimony about whether this time was a total of minutes spent throughout the day or was a block. There was testimony that she tried to help the man with his bills, not that she did his paperwork, and read him only one section of the newspaper because she lacked the concentration to do more. There was also testimony that she cooked dinner for him and did his laundry once a week. There was no testimony that she was "on call"; rather, the testimony was that the man would want her available constantly for companionship but she would have to leave the house or go upstairs to avoid him. There was also testimony that she had no other place to live. Clearly, this stopgap measure does not equate to working as a home attendant.[21]

The ALJ also concluded that the opinions of Dr. Sicuro and Ms. Fortune-Gilpin on the mental source statements each completed were not supported by their treatment records. Their assessment of her GAF at various stages of her treatment was consistent, however, with their opinions in the statements. Also consistent was Plaintiff's continuing inability to remain mentally stable for any length of time. Moreover, the opinion of Dr. Kinder and the assessment of Dr. Cottone were in the summer of 2003, when Plaintiff was living in a shelter and was not using drugs. Dr. Sicuro and Ms. Fortune-Gilpin had a longitudinal picture of Plaintiff's abilities to function, assessing her GAF at scores that ranged from 30 (an inability to function in almost all areas) to 58 (moderate symptoms). See also **Cox v. Astrue**, 495

---

[21]The Court also notes that the ALJ considered Plaintiff attending classes as being inconsistent with her complaints. The record indicates, however, that Plaintiff attended classes for less than four months. This is consistent with her pattern of being unable to sustain any activity for a long period of time.

F.3d 614, 620 (8th Cir. 2007) (noting that GAF score in forties "may be associated with a serious impairment in occupational functioning). This breath is particularly important given Plaintiff's inconsistent use of psychotropic medication and consistent return to the use of illegal drugs and alcohol.

The ALJ has a duty to fully and fairly develop the record, "'independent of the claimant's burden to press [her] case.'" **Id.** at 618 (quoting <u>Snead v. Barnhart</u>, 360 F.3d 834, 838 (8th Cir. 2004)) (alteration added). <u>Accord</u> **Stormo v. Barnhart**, 377 F.3d 801, 806 (8th Cir. 2004). This duty requires that the ALJ neutrally develop the facts, **id.**, recontacting medical sources, including treating physicians, and ordering consultative examinations if "the available evidence does not provide an adequate basis for determining the merits of the disability claim," **Sultan v. Barnhart**, 368 F.3d 857, 863 (8th Cir. 2004). And, as noted above, when assessing a claimant's RFC, "the ALJ should obtain medical evidence that addresses the claimant's 'ability to function in the workplace.'" **Lauer v. Apfel**, 245 F.3d 700, 704 (8th Cir. 2001) (quoting <u>Nevland v. Apfel</u>, 204 F.3d 853, 858 (8th Cir. 2000)).

In the instant case, the ALJ's failure to accurately assess Plaintiff's position caring for the elderly man and to recontact Dr. Sicuro and Ms. Fortune-Gilpin fatally affected her conclusions about Plaintiff's RFC. "Because this evidence might have altered the outcome of the disability determination, the ALJ's failure to elicit it prejudiced [the claimant] in [her] pursuit of benefits." **Snead**, 360 F.3d at 839 (alterations added) (noting lack of clinical findings that would have undermined physician's report that claimant could not do any work).

The ALJ also discounted Dr. Sicuro's and Ms. Fortune-Gilpin's opinions, in part, because neither had limited her ability to work. Given Plaintiff's proven inability to hold a job, however, the lack of a restriction might not be a reflection on her ability to work. See **Smith v. Barnhart**, 435 F.3d 926, 930 (8th Cir. 2006) (remanding case in which ALJ considered lack of work restriction as detracting from claimant's treating physician's opinions but had not asked physicians whether impairment might limit claimant's ability to work).

The case will be remanded for further development of the record on Plaintiff's RFC.[22]

On remand, the ALJ should also address the question whether Plaintiff has stopped using alcohol and drugs and, if not, whether her abuse of both is "a contributing factor material to the Commissioner's determination that [she] is disabled." 42 U.S.C. § 423(d)(2)(C). "In the determination of whether the substance abuse is 'material,' the claimant has the burden of demonstrating that she would still be disabled if she were to stop using drugs or alcohol." **Vester v. Barnhart**, 416 F.3d 886, 888 (8th Cir. 2005).

## Conclusion

Plaintiff might not be disabled within the meaning of the Act. The ALJ's decision that she is not disabled, however, is not supported by substantial evidence on the record as a whole for the reasons set forth above. Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is REVERSED and that this case is REMANDED for further proceedings as set forth above.

---

[22]Because the case is being remanded, the question of whether the ALJ erred by not calling a VE will not be reached.

An appropriate Judgment shall accompany this Memorandum and Order.


/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  14h  day of February, 2008.